**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**


| | |
|---|---|
| CARL D. BETHEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    1:09CV613 |
| | ) |
| FEDERAL EXPRESS CORPORATION, | ) |
| a/k/a FEDEX EXPRESS, | ) |
| | ) |
| Defendant. | ) |


**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This matter comes before the Court for a recommendation (pursuant to the Court's Amended Standing Order No. 30) on the Motion for Summary Judgment (Docket Entry 16) filed by Defendant Federal Express Corporation d/b/a FedEx Express ("FedEx"). (See Docket Entries dated Aug. 13, 2009 and May 19, 2010.) For the reasons set forth herein, the Court recommends that FedEx's Motion for Summary Judgment (Docket Entry 16) be granted.

**I.  FACTS**[1]

This action arises out of FedEx's discharge of its former employee, Carl D. Bethel. (See Docket Entry 4.) On September 15, 1986, Bethel began a part-time courier/handler job at FedEx in Springfield, Virginia, and, after about a year, became a full-time courier with the company. (Docket Entries 4, ¶ 4; 18-4 (Bethel

---

[1] As noted in Section II.A., _infra_, p.11, the Court derives these facts by viewing the record evidence in the light most favorable to Bethel.

Dep.) 33:24-35:5; 18-8 at 2.)[2]  At the time of his hiring, Bethel signed a statement:

> That should I be given employment either in the position applied for or any other, now or hereafter, such employment shall be for an indefinite period and may be terminated at any time without **notice** or **liability** for wages or salary, except such earned at date of such termination, and without any other liability whatsoever . . . .

(Docket Entry 18-7 at 5 (emphasis in original).)

FedEx maintains a manual titled the "Employee Handbook." (Docket Entry 18-4 at 36:10-22.)  Bethel was familiar with the Employee Handbook, had read it, and "knew the procedures." (<u>Id.</u> at 36:10-38:25.)  He admits receiving an Employee Handbook "every time they came out" and signed Record of Receipts for handbooks in 1989, 1992, and 1994, and other forms acknowledging receipt of handbooks in 1996 and 2002.  (Docket Entries 18-4 at 37:1-14; 18-9 at 1-4.)[3]

FedEx also provided Bethel with access to a policy and procedure manual titled "The People Manual." (Docket Entry 18-4 at 39:1-6; <u>see</u> Docket Entry 23-1.)  The People Manual describes the

---

[2] The documents and their respective page citations reflect the document identifier and page numbers in the case management/electronic case filing system ("CM/ECF") footer on each page, rather than FedEx's exhibit identification system which includes appendix exhibits and exhibits to those appendix exhibits.  For depositions, references include "page:line" citations.

[3] FedEx asserts that, "[e]ach time [Bethel] received an Employee Handbook, Bethel signed a written acknowledgment" that made certain assertions, including: "The *FedEx Employee Handbook* is not a contract of employment, nor should its provisions be read or implied to provide for one." (Docket Entry 17 at 3 (citing Docket Entries 18-4 at 36; and 18-9) (emphasis in original).)  FedEx's manner of citation makes it appear as if all the documents signed by Bethel included this quoted language.  The Records of Receipt do not bear the quoted language, but do convey similar information.  (<u>See</u> Docket Entry 18-9 at 1-2.)

Guaranteed Fair Treatment Procedure/EEO Complaint Process ("GFTP"), "for handling employee complaints, problems, concerns, and allegations of employment discrimination." (Docket Entry 23-1 at 1.)[4] "All employees who receive discipline, including termination, or treatment that they believe to be unfair are eligible to participate in the GFTP/EEO process." (Id.) The GFTP begins with an employee "hold[ing] an open and frank discussion as soon as possible with their immediate manager before entering the process[,]" only if that discussion is "unsatisfactory" does an employee need to submit a complaint to begin the next step of management review. (Docket Entries 23-1 at 2; 23-2 at 1.)[5]

During Bethel's employment in Virginia, FedEx issued him various reprimands, including:

1) a "Performance Reminder," dated July 10, 1989, for failure to call or show up for work as scheduled (Docket Entry 21-3);[6]

_____

[4] FedEx attached a copy of The People Manual dated June 25, 2006, to one of its filings. (Docket Entry 23-1.) Bethel acknowledged that the GFTP existed as of his first disciplinary action on July 10, 1989. (Docket Entry 18-4 at 41:2-11.)

[5] The People Manual describes the GFTP as a three-step process (Docket Entry 23-1), but that description fails to account for the initial meeting stage with a manager. In some instances when Bethel states that he did not "file a GFT," he appears to mean that he did not file a complaint to begin stage two, although he did engage in a discussion with a member of management. (See Docket Entry 18-4 at 43:11-13; 59:25-60:2; 60:15-61:3.)

[6] Bethel "disagreed with the ruling on this," but did not appeal it. (Docket Entry 18-4 at 41:9-11.)

2) a "Warning Letter," dated September 11, 1990, for "unacceptable" conduct toward a customer (Docket Entry 21-4);[7]

3) a "Written Performance Reminder/Decision Day (Attendance)," dated February 20, 1991, regarding "attendance related problems" (Docket Entry 21-5);[8] and

4) a "Warning Letter," dated March 9, 1992, for "driv[ing] a company vehicle on a suspended license" (Docket Entry 21-8 at 1).[9]

As a result of his failure to obtain a commercial driver's license ("CDL"), on March 30, 1992, Bethel went on a 60-day unpaid personal leave. (Docket Entry 21-9.) FedEx granted Bethel

---

[7] A FedEx report described the unacceptable conduct as follows:

> CUST CALLING IN TO REPORT THE COURIER THAT COMES IN IN THE MORNING HE HAS ON SEVERAL OCCATIONS MADE ADVANCES TO HER..SHE HAS TRIED NOT TO BE RUDE TO HIM AND PUT OFF HIS ADVANCES HOWEVER SHE HAS FELT INTIMIDATED BY THIS COURIER.... TODAY HE GOT VERY CLOSE TO HER AND HANDED HER A PC OF PAPER WITH HIS PHONE : REQUESTING SHE NOT THROW IT AWAY.. SHE IS BEGINNING TO FEEL FRIGHTENED AND DOES NOT WANT THIS PERSON COMING BACK TO HER LOCATION AGAIN.....

(Docket Entry 21-4 at 2 (emphasis and various errors in original).) Bethel "[d]isagree[d] with that" reprimand and claimed that he had a conversation with his manager, but did not file a complaint to begin the next step of the GFTP. (Docket Entry 18-4 at 43:7-13.)

[8] Bethel took issue with this reminder, but failed to use the GFTP to appeal. (Docket Entry 18-4 at 44:6-14.)

[9] Bethel explained that his county vehicle stickers expired and that he received two tickets (which he paid), but that his payments were not properly entered, whereafter, on February 21, 1992, he learned from a police officer that his license was suspended. (Docket Entry 18-4 at 47:1-18; see also Docket Entry 21-6 at 1.) On February 27, 1992, FedEx issued a "Termination" letter to Bethel as a result of his suspended license. (Docket Entry 21-6.) After a meeting between Bethel, the district managing director, and several other individuals, FedEx decided to overturn the termination in favor of a warning. (Docket Entries 21-7; 18-4 at 48:8-13.)

permission to use a company vehicle to obtain his CDL and authorized him to apply for positions if he did (but did not hold his position open). (Id.) On May 11, 1992, FedEx provided Bethel a letter documenting that he had "requested to terminate [his] employment with Federal Express" and that "written communication [was] needed from [him] stating [his] request to resign." (Docket Entry 21-10.) Bethel signed the letter, acknowledging its receipt, and wrote: "I have'nt [sic] been able to get my CDL/Road Test on 05/15/92 due to previous warning letter on file [sic] I have no alternative and request to resign from Federal Express." (Id.)[10]

Bethel soon re-joined FedEx after a manager at FedEx's facility in Greensboro, who Bethel had contacted, informed him about an open part-time position; according to Bethel: "they invited me here to work now switching from Virginia CDL to North Carolina." (Docket Entry 18-4 at 52:1-2.) Bethel's Application for Employment with FedEx's facility in Greensboro reflects its submission on June 4, 1992, and its receipt on June 17, 1992. (Docket Entry 18-8.) That application included the statement:

> That during the term of my employment which
> term I understand is indefinite, I will comply
> with the guidelines set forth in the Company's

_____

[10] Bethel later characterized his "brief time off" from FedEx after his submission of this letter as a transfer:

> Q . . . [D]id you submit a resignation to the people - - to the FedEx up in Virginia?
>
> A No, it wasn't a resignation. It's more of a transfer.

(Docket Entry 18-4 at 54:1-10.) This characterization cannot stand in light of Bethel's use of the term "resign" in the letter he submitted to FedEx.

> [illegible] rules, regulations and procedures
> which I understand shall be amended from time
> to time.  I ALSO AGREE THAT MY EMPLOYMENT
> [illegible] COMPENSATION CAN BE TERMINATED
> WITH OR WITHOUT CAUSE AND WITHOUT NOTICE OR
> LIABILITY WHATSOEVER AT ANY TIME AT
> [illegible] OPTION OF EITHER THE COMPANY OR
> MYSELF.

(Docket Entry 18-8 at 4 (emphasis in original).)  On February 4, 1999, FedEx provided a letter to Bethel stating:  "We are pleased to offer you the position of full time courier (job code R0002) courier [sic] at the GSXA Station."  (Docket Entry 18-1 at 5.) Bethel remained employed with FedEx until July 18, 2006, when FedEx fired him (Docket Entry 23-4).

During Bethel's first eight years of employment in Greensboro, FedEx issued him the following disciplinary reprimands:

1) memos, dated May 5 and October 8, 1993, regarding improperly sorted packages (Docket Entry 22-1 at 1-2);[11]

2) a "Reminder Letter," dated February 12, 1998, regarding three missed pickups (id. at 3);

3) a "Documented Counseling" memorandum, dated August 12, 1999, regarding a missed pickup (id. at 5);

4) "Documented Counseling" memoranda, dated August 20 and October 29, 1999, regarding late pickups (Docket Entries 22-2 at 1-2; 18-4 at 57:4-12);

---

[11] FedEx asserts that Bethel received three notices regarding improper sorting of packages in 1992 and 1993 (Docket Entry 17 at 4 (citing Docket Entries 18-1 at 54-56; 22-1)), but the cited references do not support this assertion.

5) a "Documented Discussion" memorandum, dated October 20, 1999, regarding "late drop box scan(s)" (Docket Entry 22-2 at 3); and

6) a "Documented Counseling" memorandum, dated January 23, 2000, stating that his "interaction with a customer was deemed rude" (Docket Entries 22-2 at 4; 18-4 at 57:19-24).[12]

Over the next six years, Bethel received a series of warnings and related discipline for a variety of serious matters:

1) a "Warning Letter," dated August 1, 2000, because "[a]fter a full investigation and questioning of witnesses it was determined that [he] did in fact strike [a co-worker]" (Docket Entry 22-4);[13]

2) a "Warning Letter," dated October 19, 2004, for violating FedEx's Harassment Policy and Acceptable Conduct Policy with respect to a neighbor of a FedEx customer (resulting in a "seven day un-paid suspension") (Docket Entry 22-5);[14]

_____

[12] Bethel did not utilize the GFTP to contest any of these matters. (Docket Entry 18-4 at 57:25-58:1.)

[13] The co-worker stated that "she asked [Bethel] after the first time [he struck her] to stop but [Bethel] continued. She explained that she asked [Bethel] again to stop and [Bethel] responded that [he] would 'cut her like a man.'" (Docket Entry 22-4.) Bethel reported speaking with a manager who told Bethel that he "felt it was orchestrated." (Docket Entry 18-4 at 60:1-2.) However, Bethel did not take any additional GFTP actions. (Id. at 59:24-25.)

[14] According to Bethel, he spoke with Greg Taylor in human resources about this incident and Taylor "concluded that [Bethel] didn't do what was said that [he] did, but [Bethel] never got any letters saying that it was changed. It was just basically closed." (Docket Entry 18-4 at 60:15-61:3.)

3) a "Warning Letter/Conduct," dated August 26, 2005, for "disruptive and unprofessional" behavior (Docket Entry 18-1 at 6);[15] and

4) a "Warning Letter-Acceptable Conduct," dated May 15, 2006, for being "extremely rude, aggressive and raising [his] voice" during a pick-up (Docket Entry 22-3 at 1).

On the May 15, 2006 warning letter, Bethel wrote: "Disagree with this ruling. Did nothing wrong[.]" (Docket Entries 22-3 at 1; 18-4 at 59:2-6.) On June 2, 2006, Michael Saladino, a FedEx Managing Director, issued a "GFTP Step I Response" to Bethel stating that, on May 31, 2006, a GFTP conference call took place regarding Bethel's receipt of "a warning letter . . ., for engaging in unprofessional conduct with a customer, as well as to determine if the treatment [Bethel] received was both fair and in accordance with [FedEx's] People, Service, Profit philosophy." (Docket Entry 23-3 at 1.) Saladino explained that "[t]he most recent complaint noted that you were very rude and aggressive in your response to the customer, when you explained they would be charged for an on-call." (Id.) Saladino "decided to uphold management's decision to issue a warning letter"; Bethel received an unpaid suspension and

---

[15] A customer complained that Bethel "interrupted a meeting in an attempt to resolve a dispute with an employee at Spectrum Laboratories. As a result of the complaint [Tim Edmonds, Operations Manager,] was able to confirm that [Bethel] did enter a conference room, uninvited, with a meeting in progress." (Docket Entry 18-1 at 6.) The record does not reflect any effort by Bethel to challenge this warning via the GFTP.

notice that he would "be subject to termination if [he] receive[d] another complaint." (<u>Id.</u> at 2.)[16]

On July 18, 2006, FedEx issued a memorandum titled "Performance Reminder/Termination-Missed P/U." (Docket Entry 23-4.)  It stated that Bethel missed picking up 32 packages and that his "employment ha[d] been terminated with FedEx for receiving a combination of three warning and/or reminder letters within a twelve month period." (<u>Id.</u>)  Bethel refused the GFTP packet to appeal this action (Docket Entry 18-4 at 66:15-19) and the record does not reflect that he initiated any review via the GFTP.

On July 1, 2009, Bethel filed a Complaint in the General Court of Justice for Rockingham County, Superior Court Division. (Docket Entry 1-1 at 4.)  On August 12, 2009, FedEx removed this action to this Court on the basis of diversity of citizenship (Docket Entry 1, ¶ 5) and, on March 1, 2010, FedEx filed the instant motion (Docket Entry 16).  The response to the motion was due by April 5, 2010. (<u>See</u> Docket Entry dated Mar. 1, 2010.)

On April 28, 2010, the Clerk of Court sent Mr. C. Orville Light, Bethel's counsel, a letter noting the absence of a response to FedEx's summary judgment motion and stating that, "[i]f the motion is opposed and excusable neglect can be shown for having failed to respond, [the Clerk] will submit the explanation and

---

[16] Bethel did not pursue any further review under the GFTP with respect to this incident. (Docket Entry 18-4 at 59:7-8.)

proposed response to the Court." (Docket Entry 25.) On June 10, 2010, Mr. Light filed a response. (Docket Entry 26.)[17]

## II. DISCUSSION

The relevant portions of Bethel's eleven-sentence Complaint state as follows:

> 3. The Defendant has a cause of action for breach of contract for earnings and benefits which occurred in Guilford County, North Carolina on July 3, 2006.

> 4. The Plaintiff was employed by Defendant on September 15, 1986 with an agreement to pay the Plaintiff a bonus on completion of 20 years of service with other employment earnings and benefits for long term service.

> 5. The Defendant improperly discharged the Plaintiff on July 3, 2006 just over two months before said bonus was to be paid.

> 6. Plaintiffs [sic] employment term just as any contract requiring performance by Plaintiff has an implied warranty of fair dealing, including the warranty not to interfere with the successful completion of said agreement.

> 7. The Defendant terminated the Plaintiff in keeping with its practice of making up charges to excuse terminating employees as they approach bench mark dates.

---

[17] The 13-sentence response, with an attached affidavit from Bethel, provides no citation to any legal authority or evidentiary materials. (See Docket Entry 26.) Bethel did not seek a continuance to file the Response late, see Fed. R. Civ. P. 6(b); M.D.N.C. R. 6.1(a), nor did he provide any explanation for filing the Response late (see Docket Entry 26). Because Plaintiff "fail[ed] to file a response within the time required by [this Court's Local Rule 7.3(f)], the motion will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice." M.D.N.C. R. 7.3(k). Nevertheless, the Court proceeds with additional analysis in light of the preference for merits-based resolution of claims. See United States v. Moradi, 673 F.2d 725, 727 (4th Cir. 1982) ("[T]he clear policy of the Rules is to encourage dispositions of claims on their merits . . . .").

10

8.   The Plaintiff was not provided due
               process.

(Docket Entry 4, ¶¶ 3-8.)  Bethel thus appears to bring claims for

(1) breach of contract; (2) interference with ERISA benefits; (3)

breach of an implied covenant of good faith and fair dealing; (4)

tortious interference with contract; and (5) due process violation.

A.  Summary Judgment Standard

     Summary judgment is appropriate where the evidence on file

shows that "there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(c)(2).  A genuine issue of fact exists if the

evidence presented could lead a reasonable fact-finder to return a

verdict in favor of the non-moving party.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 255 (1986).  A fact is material only if

it might affect the outcome of the case under the governing law.

Id. at 248.  The Court must view the evidence and any reasonable

inferences drawn from the evidence in a light most favorable to the

nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 587 (1986) (citation omitted).

     The moving party may discharge its burden by identifying an

absence of evidence to support the nonmoving party's case.  See

Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Accord

Simmons-Blount v. Guilford County Bd. of Educ., No. 1:06CV944, 2010

U.S. Dist. LEXIS 34485, at *8-9 (M.D.N.C. Apr. 7, 2010)

(unpublished) (Beaty, C.J.).  The non-moving party must then "set

forth specific facts showing that there is a *genuine issue for*

*trial*." <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586-87 (citation omitted) (emphasis in original). The nonmoving party must convince the Court that evidence exists upon which a finder of fact could properly return a verdict in favor of the nonmoving party. <u>Anderson</u>, 477 U.S. at 252 (citation omitted). <u>Accord</u> <u>Simmons-Blount</u>, 2010 U.S. Dist. LEXIS 34485, at *8-9. <u>See also</u> <u>Francis v. Booz, Allen & Hamilton, Inc.</u>, 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

   B.  Conflict of Law/Applicable State Law

   In diversity cases, federal courts follow the conflict of laws rules of the jurisdiction in which the court sits, in this case, North Carolina. <u>See</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.</u>, 313 U.S. 487, 494 & 496 (1941) (cited with approval in <u>Wells v Liddy</u>, 186 F.3d 505, 521 (4th Cir. 1999); <u>Rhone-Poulenc Agro S.A. v. Monsanto Co.</u>, 73 F. Supp. 2d 554, 554 (M.D.N.C. 1999) (Tilley, J.)). The same rule applies when federal courts exercise supplemental jurisdiction over state law claims. <u>Itco Corp. v. Michelin Tire Corp.</u>, 722 F.2d 42, 49 n.11 (4th Cir. 1983).[18]

   Under North Carolina law, "the interpretation of a contract is governed by the law of the place where the contract is made."

---

[18] This action was originally removed to this Court on the basis of diversity jurisdiction, 28 U.S.C. § 1332 (Docket Entry 1, ¶ 5); because Bethel raises an ERISA claim and a due process claim, this action could have been removed on the basis of federal question jurisdiction, 28 U.S.C. § 1331, such that his state law claims would fall under the Court's supplemental jurisdiction, 28 U.S.C. § 1367.

Rhone-Poulenc Agro S.A., 73 F. Supp. 2d at 556 (citing Tanglewood Land Co. v. Byrd, 299 N.C. 260, 262 (1980)). Accord Norman v. Tradewinds Airlines, Inc., 286 F. Supp. 2d 575, 584 (M.D.N.C. 2003) (Dixon, M.J.). For reasons set forth below (see infra, pp. 13-20), no employment contract was formed between the parties. However, Bethel completed the Application for Employment with FedEx's Greensboro facility in North Carolina. (See Docket Entry 18-8 at 7; Docket Entry 18-4 at 52:4-8.) Therefore, the Court will apply North Carolina law to Bethel's contract claims.

For tort claims, North Carolina applies the law of "the situs of the claim," i.e., where the injury occurred. Boudreau v. Baughman, 322 N.C. 331, 335, 368 S.E.2d 849, 854 (1988) (as recognized in Norman, 286 F. Supp. 2d at 584). Here, Bethel's tort claim arose in North Carolina (the site of the termination of his employment). Consequently, the Court also will apply North Carolina law in addressing Bethel's tort claim.

C. Breach of Contract

Bethel claims that FedEx breached an employment contract with him. (Docket Entry 4, ¶ 3.) In North Carolina, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Poor v. Hill, 138 N.C. App. 19, 27, 530 S.E. 2d 838, 843 (2000) (cited with approval in Ahmadi v. Triangle Rent A Car, Inc., 691 S.E.2d 101, 103 (N.C. App. 2010)). "Under North Carolina law, employment is at-will." Norman, 286 F. Supp. 2d at 585 (citing Kurtzman v. Applied Analytical Indus., Inc., 347 N.C. 329, 331, 493 S.E.2d 420,

422 (1997)).  Indeed, the Supreme Court of North Carolina "has repeatedly held that in the absence of a contractual agreement between an employer and an employee establishing a definite term of employment, the relationship is presumed to be terminable at the will of either party without regard to the quality of performance of either party."  Kurtzman, 347 N.C. at 331, 493 S.E.2d at 422 (cited with approval in Norman, 286 F. Supp. 2d at 585).

The Supreme Court of North Carolina has identified three exceptions to the presumption of "at-will" employment:

> First, . . . parties can remove the at-will presumption by specifying a definite period of employment contractually.  Second, federal and state statutes have created exceptions prohibiting employers from discharging employees based on impermissible considerations such as the employee's age, race, sex, religion, national origin, or disability, or in retaliation for filing certain claims against the employer.  Finally, this Court has recognized a public-policy exception to the employment-at-will rule.  See Amos v. Oakdale Knitting Co., 331 N.C. 348, 416 S.E.2d 166 (1992) (discharging an employee for refusing to work for less than minimum wage violates public policy); Coman v. Thomas Mfg. Co., 325 N.C. 172, 381 S.E.2d 445 (1989) (discharging an employee for refusing to falsify driver records to show compliance with federal transportation regulations offends public policy).

Kurtzman, 347 N.C. at 331-32, 493 S.E.2d at 422 (some internal citations omitted).[19]

_____

[19] Prior to Kurtzman, the Court of Appeals of North Carolina had recognized an additional exception where an employee provided consideration such as moving:

> Generally, employment contracts that attempt to provide for permanent employment, or "employment for life," are
>
> (continued...)

14

Finally, "the law of North Carolina is clear that unilaterally promulgated employment manuals or policies do not become part of the employment contract unless expressly included in it." <u>Walker v. Westinghouse Elec. Corp.</u>, 77 N.C. App. 253, 259, 335 S.E.2d 79, 83-84 (1985) (cited with approval in <u>Norman</u>, 286 F. Supp. 2d at 585). <u>Accord</u> <u>Guarascio v. New Hanover Health Network, Inc.</u>, 163 N.C. App. 160, 164, 592 S.E.2d 612, 614, <u>discretionary review denied</u>, 358 N.C. 375, 597 S.E.2d 130 (2004). "In order to find a handbook 'expressly incorporated' into a contract, North Carolina courts require language that unmistakably indicates such incorporation." <u>Norman</u>, 286 F. Supp. 2d at 586. <u>See also</u> <u>Walker</u>, 77 N.C. App. at 260, 335 S.E.2d at 84 (concluding that handbook was not included in contract, despite language promising to "become

---

[19](...continued)
> terminable at will by either party. Where the employee gives some special consideration in addition to his services, such as relinquishing a claim for personal injuries against the employer, *removing his residence from one place to another in order to accept employment*, or assisting in breaking a strike, such a contract may be enforced.

<u>Sides v. Duke Univ.</u>, 74 N.C. App. 331, 345, 328 S.E.2d 818, 828 (1985) (emphasis in original) (quoting <u>Burkhimer v. Gealy</u>, 39 N.C. App. 450, 454, 250 S.E.2d 678, 682 (1979)). The Supreme Court of North Carolina, however, rejected the <u>Sides</u> holding and held that an employee's "change of residence in the wake of defendant-employer's statements here does not constitute additional consideration making what is otherwise an at-will employment relationship one that can be terminated by the employer only for cause." <u>Kurtzman</u>, 347 N.C. at 334, 493 S.E.2d at 423-24. In light of <u>Kurtzman</u>, the Court will not address: the implications of Bethel's move to North Carolina; his decision to "not follow a separate career path by alternate training experience or education"; or his assertion that "Defendant benefitted from the foregoing actions and representation [sic] by developing and retaining a stable work force of career minded employees" (Docket Entry 26 at 1).

15

more than a handbook . . . it will become an understanding"
(internal quotation marks omitted and ellipsis in original)).

Bethel alleges in conclusory fashion that FedEx employed him
pursuant to "an agreement." (Docket Entry 4, ¶ 4.) The record,
however, establishes as a matter of law that Bethel was an at-will
employee. As a result, no reasonable finder of fact could return
a verdict for Bethel on his breach of contract claim.

Notably, Bethel admits that he was never promised he could
work at FedEx for a specific period. (Docket Entry 18-3 at 2.)[20]
Bethel's applications each established at-will employment for an
indefinite period. (See Docket Entries 18-7 at 5; 18-8 at 4.)
Bethel acknowledges this fact. (Docket Entry 18-3 at 2.)
According to the Complaint, FedEx employed Bethel pursuant to an
"agreement to pay [him] a bonus on completion of 20 years of
service . . . ." (Docket Entry 4, ¶ 4.)[21] However, Bethel concedes
that he had no contract guaranteeing him a job for 20 years:

> Q [FedEx's counsel] . . . You believe that you
> had a contract that would allow you to
> complete 20 years of service with FedEx?

---

[20] According to Bethel, "Defendant promised certain benefits which are
[sic] subject matter of this suit if he would work for a specified period of
time[.]" (Docket Entry 18-3 at 2.) Bethel does not identify these benefits and
the Court addresses the potential interference with pension benefits issue later
in this Recommendation, infra, pp. 22-26.

[21] FedEx denies the existence of any policies that would have rewarded
Bethel with a bonus for 20 years of service. (Docket Entry 18-1, ¶ 9.) Bethel
believes he would have received a bonus (Docket Entry 18-4 at 19:17-22), but he
does not identify any documentation regarding such a bonus or, more importantly,
of a right to retain his job for 20 years; indeed, Bethel recognizes that he had
no such guarantee. (Docket Entry 18-4 at 20:7-13.)

A [Bethel] Well, the completion of 20 years of service with FedEx would allow you to retire.

Q Okay. And is there any contract that you're aware of between you and FedEx that says that you will be allowed to work until you complete 20 years?

A No.

Q It's your _desire_ to have completed, had everything worked out fine, the 20 years and then retire thereafter?

A _Yes_.

Q Okay. Is that what you mean by the contract?

A Yes.

(Docket Entry 18-4 at 18:24-19:13 (emphasis added).) An employee's _desire_ to spend 20 years with an employer (even if shared by that employer) does not suffice to create an employment contract under North Carolina law. See Roberts v. Wake Forest Univ., 55 N.C. App. 430, 435, 286 S.E.2d 120, 124 (1982) (stating that employer's indication that "they expected [plaintiff] to be with [employer] . . . for a substantial period" did not demonstrate "intention of the parties for a fixed term of employment").

According to Bethel, FedEx's The People Manual and Employee Handbook created an implied contractual relationship in the absence of an express contract. (See Docket Entry 18-3 at 2-3; 26 at 1 & 3.) The Record of Receipt Bethel signed upon dissemination of the Employee Handbook in 1989 and 1992 provides that he "understand[s] that it is not a contract . . . ." (Docket Entry 18-9 at 1-2.) Similarly, the acknowledgment forms Bethel signed upon receiving Employee Handbooks in 1992 and 2002 include the disclaimer that the

Employee Handbook "is not a contract of employment . . . ."  (<u>Id.</u> at 3-4.)   Furthermore, Bethel admits that the "policies or procedures of the Company provide guidelines for management . . ., but do not create contractual rights regarding termination or otherwise."   (Docket Entry 18-3 at 3.)   Neither the Employee Handbook nor The People Manual "expressly" indicate their "inclusion" in an employment contract, <u>see</u> <u>Walker</u>, 77 N.C. App. at 259, 335 S.E.2d at 83-84; to the contrary, the Employee Handbook and The People Manual include express language stating that they are not contracts (<u>see</u> Docket Entries 19-1 at 3; 22-9 at 1).[22] Thus, the Employee Handbook and The People Manual are not "expressly included" in an employment contract.[23]

_____

[22] The handbook provides: "THE *FEDEX EXPRESS EMPLOYEE HANDBOOK* IS NOT A CONTRACT OF EMPLOYMENT, NOR SHOULD ITS PROVISIONS BE READ OR IMPLIED TO PROVIDE FOR ONE.   YOUR EMPLOYMENT IS AT-WILL."  (Docket Entry 19-1 at 3 (emphasis in original).)  The People Manual states that the "employment relationship . . . may be terminated at the will of either party" and "the policies and procedures set forth in this manual provide guidelines . . . , but do not create contractual rights regarding termination or otherwise."  (Docket Entry 22-9 at 1.)

[23] North Carolina courts have permitted unilateral contract theories of recovery for <u>accrued</u> employment benefits; however, "North Carolina courts have distinguished between issues of benefits or compensation earned during employment and the issue of an employee's entitlement to continued employment.   Claims for accrued benefits, as distinct from claims for prospective continued employment or working conditions, are not affected by the employment at will doctrine." <u>Jenkins v. Akzo Noble Coatings, Inc.</u>, 35 Fed. Appx. 79, 84-85 (4th Cir. 2002) (internal quotation marks, brackets and citations omitted).  Bethel does not seek a remedy for any failure on FedEx's part to provide him with any accrued benefits for past service and thus he cannot recover under a unilateral contract theory. <u>See</u> <u>Guarascio</u>, 163 N.C. App. at 165, 592 S.E.2d at 615.   Just as the North Carolina Court of Appeals declined "to apply a unilateral contract analysis to the issue of wrongful discharge" because such an approach "would, in effect, require [it] to abandon the 'at-will' doctrine which is the law in this State," <u>id.</u> (internal quotation marks omitted), this Court cannot allow Bethel's contract claim to proceed in light of North Carolina's at-will doctrine.

Numerous courts have examined these same materials and have reached similar conclusions. See Semple v. Fed. Express Corp., 566 F.3d 788, 793 (8th Cir. 2009) (holding that, under South Dakota law, "Federal Express's employment manual does not create an implied for cause contract"); DeMartra v. Fed. Express Corp., No. 94-3198, 1995 U.S. App. LEXIS 6161, at *3 (8th Cir. Mar. 28, 1995) (unpublished) ("The language of [The People Manual] upon which [plaintiff] relies is far too slender a reed upon which to rest the purported contractual obligation."); Turner v. Fed. Express Corp., 539 F. Supp. 2d 404, 410-11 (D.D.C. 2008) (ruling that, under the law of the District of Columbia, FedEx's "employee handbook does not create an employment contract"); Byrd v. Fed. Express Corp., No. 05-2648(RBK), 2008 U.S. Dist. LEXIS 16891, at *18 (D.N.J. Mar. 4, 2008) (unpublished) (holding that FedEx's Employee Handbook "does not give rise to a contract" under New Jersey law), aff'd, 318 Fed. Appx. 102 (3d Cir. 2009). See also Soto v. Fed. Express Corp., No. 06-CV-5413(SLT)(KAM), 2008 U.S. Dist. LEXIS 7688, at *19-20 (E.D.N.Y. Feb. 1, 2008) (unpublished) (applying New York law and holding "that the GFTP [in The People Manual] fails to constitute an express limitation on Plaintiff's at-will employment status") (citing Cowen v. Fed. Express Corp., 25 F. Supp. 2d 33, 37 (D. Conn. 1998); Aquinas v. Fed. Express Corp., 940 F. Supp. 73, 80 (S.D.N.Y. 1996); Montalvo v. Fed. Express Corp., No. 94 CIV. 7858, 1995 U.S. Dist. LEXIS 18335, 1995 WL 733600, at *2 (S.D.N.Y. Dec. 11, 1995) (unpublished); Leahy v. Fed. Express Corp., 609 F. Supp. 668, 672 (E.D.N.Y. 1985)). But see Price v. Fed. Express Corp.,

19

660 F. Supp. 1388, 1393 & 1395 (D. Colo. 1987) (ruling that, under Colorado law, breach of "representations made in employment handbooks or manuals concerning procedures to be followed in discharge decisions" would support contractual claim).

Bethel also appears to assert that FedEx created an oral employment contract:

> At all times during my employment, we had team meetings pointing out the benefits of remaining with Fed-Ex until retirement. We also received personal book setting forth these promises.
>
> Fed-Ex also promised to fairly deal with [sic] in employment matters.
>
> This promise was in keeping with the common sense implied covenant for fair dealing.

(Docket Entry 26 at 3 (errors in original).) In order to support a breach of contract claim, even oral promises of employment must set forth a definite term of employment. Williams v. City of High Point, No. 1:98CV01029, 1999 U.S. Dist. LEXIS 21378, at *36-38 (M.D.N.C. Nov. 2, 1999) (Bullock, J.) (finding that oral contract was terminable at will because it did not fix definite term of employment). Bethel does not identify any definite term of employment in any alleged oral contract; thus, any such oral representations cannot give rise to a contract claim.

Moreover, even if the Employee Handbook and The People Manual had become expressly incorporated in an employment contract, Bethel has failed to raise a genuine issue of material fact regarding FedEx's "breach of the terms of that contract," Poor, 138 N.C. App. at 27, 530 S.E.2d at 843. Bethel claims that he was

"improperly discharged" (Docket Entry 4, ¶ 5), which he explained as follows:

> Q . . . Paragraph number five it says that
> FedEx improperly discharged you on July 3rd.
> What was improper about your discharge?
>
> A The charges I was -- the letters, warning
> letters of misconduct --
>
> Q Okay.
>
> A -- that I disagreed with.
>
> Q Okay. Is there anything else that you mean
> when the term "improper discharge" is used
> there other than the fact that you disagreed
> with the warning letters that resulted in your
> discharge?
>
> A No.

(Docket Entry 18-4 at 20:14-25.)

As set forth in Section I (<u>supra</u>, pp. 3-9), the record reflects that Bethel had the opportunity to use the GFTP to appeal reprimands with which he disagreed, but that he generally did not, including for many of the most serious matters and the final discipline that resulted in the termination of his employment. Because Bethel failed to use the process available to him to contest personnel actions under the alleged contractual documents on which he relies, he cannot maintain a breach of contract claim regarding those personnel actions.

Finally, the record establishes that Bethel's termination was consistent with FedEx's policies and procedures, which provided:

> Termination normally results upon receipt of
>
> • three unsatisfactory performance reviews,
>   or

- three performance reminders, or

- a combination of any type of notification (including warning letters for misconduct) totaling three within a 12-month period . . . .

(Docket Entry 18-1 at 11.) Bethel accumulated three notifications within a twelve-month period, including an August 26, 2005 "Warning Letter/Conduct" (Docket Entry 18-1 at 6); a May 15, 2006 "Warning Letter-Acceptable Conduct" (Docket Entry 22-3 at 1); and a July 18, 2006 "Performance Reminder/Termination-Missed P/U" (Docket Entry 23-4). Under these circumstances, no genuine issue of material facts exists as to whether FedEx breached any provision of a contract, assuming that one existed.

In sum, FedEx is entitled to judgment as a matter of law with respect to this claim.

D. Section 510 of ERISA

Bethel appears to assert an interference with pension benefits claim under the Employee Retirement Income Security Act ("ERISA"), based on FedEx's termination of his employment "just over two months before [a pension-related] bonus was to be paid" (Docket Entry 4, ¶ 5; see also Docket Entry 18-4 at 19:17-22 (clarifying that "bonus" identified in Complaint referred to pension)). Section 510 of ERISA, 29 U.S.C. § 1140, governs claims of this sort:

> It shall be unlawful for any person to discharge . . . a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the

> plan, this subchapter, or the Welfare and
> Pension Plans Disclosure Act.

29 U.S.C. § 1140.  This provision grants "employees waiting to vest in a qualified pension plan a cause of action against an employer who discharges them for the purpose of blocking their vesting in the company's pension plan" and also "gives, fully vested employees a cause of action against an employer who acts to prevent accrual of *additional* benefits."  <u>Conkwright v. Westinghouse Elec. Corp.</u>, 933 F.2d 231, 236 (4th Cir. 1991) (emphasis in original).

The United States Court of Appeals for the Fourth Circuit has stated that "ERISA does not guarantee every employee a job until he or she has fully vested into a company's benefit plan.  Rather, ERISA guarantees that no employee will be terminated where <u>the purpose</u> of the discharge is the interference with one's pension rights."  <u>Id.</u> at 238 (emphasis added).  To distinguish between "firings which have an incidental, albeit important effect on an employee's pension rights from the actionable firings, in which the effect of the firing on the employer's pension obligation was a motivating factor in the firing decision," a plaintiff must "prove a specific intent of the employer to interfere with the employee's pension rights."  <u>Id.</u> at 238-39.

Because "employers rarely, if ever, memorialize their specific intent to act unlawfully[,] . . . the *McDonnell Douglas* scheme of presumptions and shifting burdens of productions is appropriate in the context of discriminatory discharge claims brought under § 510

of ERISA." Id. at 239 (emphasis in original).  As the Fourth
Circuit has explained:

> In the McDonnell Douglas framework, the
> plaintiff must first establish a prima facie
> case . . . , whereupon the burden shifts to
> the employer to establish a legitimate . . .
> reason for the action. If the employer sets
> forth a legitimate . . . explanation for the
> action, the plaintiff then must show that the
> employer's proffered reasons are pretextual or
> his claim will fail.

Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004) (addressing
McDonnell Douglas framework in retaliation context).  Accord
Flickinger v. E.I. Du Pont De Nemours and Co., 466 F. Supp. 2d 701,
710 (W.D. Va. 2006) (applying McDonnell Douglas framework to claim
brought under § 510 of ERISA).

"To establish a prima facie case of ERISA interference, [the
plaintiff] must show that (1) [the defendant] subjected her to an
adverse employment action; (2) [the plaintiff] was likely to
receive future benefits; and (3) a causal connection existed
between the adverse action and the likelihood of future benefits."
Manning v. Am. Republic Ins. Co., 604 F.3d 1030, 1043-44 (8th Cir.
2010).  A plaintiff "can meet [the] burden of proving pretext
either by showing that [the defendant's] explanation is 'unworthy
of credence' or by offering other forms of circumstantial evidence
sufficiently probative of [the prohibited motive]."  Mereish v.
Walker, 359 F.3d 330, 336 (4th Cir. 2004).  "A prima facie case
coupled with probative evidence 'that the employer's explanation is
false,' would counsel against granting the employer summary
judgment unless the employer presented other strong evidence from

24

which 'no reasonable factfinder could conclude' that there was [an unlawful purpose for the adverse action]." <u>Price</u>, 380 F.3d at 214 (internal citations omitted) (quoting <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 148-49 (2000)).

Bethel has failed to make out a prima facie case, because he has not demonstrated that he was likely to receive future benefits if he remained with FedEx or that a causal connection existed between his discharge and any such benefit. Bethel claims that he was two months away from obtaining a pension benefit based on 20 years of service. (Docket Entry 4, ¶ 5.) The record, however, reflects that Bethel's pension fully vested after five years of service and, when FedEx terminated Bethel, he "was accruing benefits under the Traditional Pension Benefit (TPB) formula of the FedEx Corporation Employee's Pension Plan. Under the TPB formula, there is no increase in the accrual rates upon an employee's attainment of 20 years of service." (Docket Entry 18-2 at 2.)[24]

Furthermore, FedEx provided a legitimate, non-discriminatory reason to terminate Bethel's at-will employment and Bethel has identified "no probative evidence that [FedEx's] explanation is false," <u>Price</u>, 380 F.3d at 214. Bethel asserts that he "notice[d] a disturbing trend that those . . . employed over fifteen years

---

[24] After 20 years of <u>continuous</u> service, Bethel would have received an extra week of paid vacation per year. (Docket Entry 18-1, ¶ 9.) However, FedEx did not credit Bethel for his employment in Virginia (Docket Entry 17 at 7 n.4), because "employees lose continuous Company service due to resignation . . . ." (Docket Entry 18-1 at 17; <u>see also</u> <u>id.</u> at 3.) Because Bethel had only 14 years of continuous service upon termination, he was not fired shortly before he would have accrued even this rather modest increased benefit.

were being discharged for assorted violations that did not constitute serious offends [sic]." (Docket Entry 26 at 3.) However, Bethel could not offer any basis for this assertion:

> Q [FedEx's counsel] . . . [P]aragraph number seven, it says that FedEx fired you or terminated your employment in keeping with its practice of making up charges to excuse terminating employees as they approach benchmark dates. Do you have any facts to support paragraph seven and that claim?
>
> A [Bethel] Well, the fact that most of the employees when they reach retirement age it's real easy to find things that you're doing wrong and terminate you to keep from paying you your benefits. And FedEx has a history of doing that.
>
> Q Okay. What is the basis of your saying that? . . . I'm asking you if you can identify any individuals that you know that that happened to?
>
> A Well, I hear about 'em.
>
> Q Okay. Any that you have personal knowledge of?
>
> A Not by name.

(Docket Entry 18-4 at 27:9-28:4.)

Under these circumstances, no genuine issue as to any material fact exists as to Bethel's ERISA claim.

### E.  Good Faith and Fair Dealing

Bethel asserts that his "employment term just as any contract requiring performance . . . has an implied warranty of fair dealing . . . ." (Docket Entry 4, ¶ 6; see also Docket Entry 26 at 1.) This claim fails for three reasons. First, no employment contract existed. Second, North Carolina law does not recognize a

wrongful discharge in bad faith claim for at-will employees. Third, Bethel did not offer evidence that FedEx acted in bad faith in contravention of any agreement.

"[A] contract contains all terms that are necessarily implied to effect the intention of the parties . . . ." <u>Maglione v. Aegis Family Health Ctrs.</u>, 168 N.C. App. 49, 56, 607 S.E.2d 286, 291 (2005) (internal quotation marks omitted). "Among these implied terms is the basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement." <u>Id.</u> (internal quotation marks omitted). "In the absence of an enforceable contract, the parties cannot have an implied covenant of good faith and fair dealing." <u>Giuliani v. Duke Univ.</u>, No. 1:08CV502, 2010 U.S. Dist. LEXIS 32691, at *28 (M.D.N.C. Mar. 30, 2010) (Osteen, Jr., J.). For the reasons previously stated (<u>see</u> <u>supra</u>, pp. 13-20), Bethel had no employment contract.

Further, the Supreme Court of North Carolina has explained that, in employment at-will situations, it does "not recognize a separate claim for wrongful discharge in bad faith." <u>Amos v. Oakdale Knitting Co.</u>, 331 N.C. 348, 359, 416 S.E.2d 166, 173 (1992) (as noted in <u>Freeman v. Duke Power Co.</u>, 114 Fed. Appx. 526, 534-35 (4th Cir. 2004); <u>Phillips v. J.P. Stevens & Co., Inc.</u>, 827 F. Supp. 349, 352 (M.D.N.C. 1993) (Osteen, Sr., J.)). Because Bethel's employment with FedEx was at-will (<u>see</u> <u>supra</u>, pp. 13-20), he cannot bring a claim for wrongful discharge in bad faith.

Finally, Bethel has failed to raise a genuine question of material fact regarding any breach of an implied covenant of good faith and fair dealing (if one existed). Bethel bases his good faith and fair dealing claim on the following:

1) FedEx did not "respon[d]" to his "side of the story or [his] proof of what actually happened in these incidents" (Docket Entry 18-4 at 21:15-20);

2) FedEx did not permit Bethel to confront complaining customers (id. at 22:4-18);

3) FedEx did not want to review e-mails from customers unrelated to the incidents (id. at 23:18-24:23); and

4) Gerald Topley, a senior manager (who, after the incidents, gave Bethel the impression that he was doing "the right thing") did not speak on Bethel's behalf during the GFTP (id. at 22:22-23:12).

The record does not afford any basis to conclude that, even if accepted as true, any of these matters demonstrate that FedEx failed to fulfill any of its obligations under the Employee Handbook or The People Manual fairly and in good faith. (See Docket Entries 23-1, 23-2.) Nor has Bethel cited any authority to support the view that the conduct about which he complains qualifies as a failure to act in good faith or to deal fairly. In essence, Bethel asserts that, because FedEx did not decide things as he wished, they failed to behave fairly or in good faith; the Court should decline to treat such a position as sufficient to defeat summary judgment.

For all these reasons, this claim fails as a matter of law.

F.  Tortious Interference With Contract

Bethel appears to assert a claim for tortious interference with a contract, by stating that his "employment term just as any contract requiring performance . . . include[s] the warranty not to interfere with the successful completion of said agreement." (Docket Entry 4, ¶ 6.)  Under North Carolina law:

> The tort of interference with contract has five elements: (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

United Labs., Inc. v. Kuykendall, 322 N.C. 643, 661, 370 S.E.2d 365, 387 (1988).

Accordingly, "[a] claim for tortious interference with a contract requires the existence of a valid contract[,]" Giuliani, 2010 U.S. Dist. LEXIS 32691, at *28-29, and (for the reasons previously stated, see supra, pp. 13-20), no such contract existed in this case.  Further, assuming that a contract did exist, a party to a contract cannot maintain an action for tortious interference with a contract against other parties to that contract, Wagoner v. Elkin City Sch. Bd. of Educ., 113 N.C. App. 579, 587, 440 S.E.2d 119, 124, cert. denied, 336 N.C. 615, 447 S.E.2d 414 (1994), because the cause of action against a party to a contract "is one for 'breach,' and there simply is no need to supplant, supplement, or duplicate that cause of action," Waters v. Collins & Aikman

Prods. Co., 208 F. Supp. 2d 593, 596 (W.D.N.C. 2002). Accord Emory Utils., Inc. v. Time Warner Cable, Inc., No. 7:09CV169BO, 2010 WL 2402888, at *3 (E.D.N.C. June 11, 2010) (unpublished) ("Both North Carolina and federal courts interpreting North Carolina law have consistently held that a party to a contract cannot tortiously interfere with its own contract." (citing Wagoner and Waters)); Cobra Capital, LLC v. RF Nitro Commc'ns, Inc., 266 F. Supp. 2d 432, 439 n.3 (M.D.N.C. 2003) (Sharp, M.J., adopted by Tilley, J.) ("[A]n independent ground on which to dismiss Cobra's tortious interference with prospective economic advantage claim [exists] as this claim requires a *third party* to interfere with the prospective economic advantage, and not an entity who, by virtue of a merger, had become a party to the proposed contract." (emphasis in original) (citing Wagoner and Waters)).

As a result, the Court should grant summary judgment to FedEx on this claim as well.[25]

---

[25] As FedEx noted in its reply (Docket Entry 27 at 2 n.2.), Bethel failed to respond to the instant motion with respect to this claim and the Court thus may grant summary judgment on the ground that Bethel has abandoned this claim. See Rogers v. Unitrim Auto and Home Ins. Co., 388 F. Supp. 2d 638, 641 (W.D.N.C. 2005) (ruling that plaintiffs who made no argument regarding particular claim in response to summary judgment motion were "effectively abandoning" said claim); Wainright v. Carolina Motor Club, Inc., No. 1:03CV01185, 2005 WL 1168463, at *13 (M.D.N.C. Apr. 27, 2005) (unpublished) (Sharp, M.J.) ("At the outset, the Court notes that Plaintiff failed to make any argument in her brief regarding her failure to promote claim. In the face of [Defendant's] arguments and supporting evidence in its brief in support of summary judgment, Plaintiff's failure to argue this claim is tantamount to abandonment of the claim. See Local Rule 7.3(k)."); Brand v. North Carolina Dep't of Crime Control and Pub. Safety, 352 F. Supp. 2d 606, 618 (M.D.N.C. 2004) (Bullock, J.) ("In Plaintiff's brief in response to Defendants' motion for summary judgment, Plaintiff does not address . . . his hostile work environment claim. By failing to respond, Plaintiff concedes that he has not stated a hostile work environment claim.").

G.  Due Process Violation

Bethel also asserts that he "was not provided due process" (Docket Entry 4, ¶ 8), based on the lack of participation of third parties at the GFTP hearing and certain other elements of the hearing.  With respect to the third parties, Bethel states:

> A [by Bethel:] Well, the fact that we were never able to meet with any of the people that actually made all of these complaints against me and come to a decision about it because, as I stated earlier, Mr. Saladino says we don't do things like that. So it left me with, you know, open, shut, shut-type case. I didn't have any option other than to hear what he had to say because there wasn't anybody listening.
>
> . . . .
>
> Q Okay.  So you were able to discuss your letter, but he told you we don't have face-to-face meetings --
>
> A Yeah.
>
> Q -- with customers over complaints?
>
> A We don't do things like that.
>
> Q Okay.  Okay.  So is that what you were referring to in paragraph eight when you're talking about due process?
>
> A Yes.

(Docket Entry 18-4 at 28:6-16, 29:16-25.)

Bethel also cites the denial of his right to counsel, to a union representative, and to present and to confront witnesses. (Docket Entry 26 at 2.)  Further, according to Bethel, "[a]ny supervisor who stood for an employee was transferred or discharged."  (Id.)  Finally, Bethel complains that FedEx denied

him an "impartial panel," subpoena power, and the right to see written reports. (<u>Id.</u>)

Bethel's Complaint and response to the instant motion fail to make clear the legal grounds for this cause of action. However, Bethel's due process claim (whether made under the Constitution of North Carolina or the United States) fails for lack of state action:

> [P]laintiff contends that [her employer] violated her rights under the due process . . . clauses of the Fifth and Fourteenth Amendments to the United States Constitution . . . [and] the North Carolina counterpart to the Fourteenth Amendment's due process clause, the law of the land clause in section 19 of article I of the North Carolina Constitution. No claim exists under any of these provisions, among other reasons, because they protect only against governmental action and not the actions of a private employer, and there are no allegations in the complaint that [Plaintiff's employer] is anything but a private employer. *See, e.g.*, <u>San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.</u>, 483 U.S. 522, 542, 107 S. Ct. 2971, 97 L. Ed. 2d 427, n.21 (1987) (Fourteenth and Fifth Amendments); <u>Blum v. Yaretsky</u>, 457 U.S. 991, 1002-03, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982) (Fourteenth Amendment); <u>Freeman v. Duke Power Co.</u>, 114 Fed. Appx. 526, 2004 WL 2151269, at *7 (4th Cir. 2004) (N.C. Const. art. I § 19), *cert. denied*, 544 U.S. 968, 125 S. Ct. 1733, 161 L. Ed. 2d 616 (2005).

<u>Wells v. Moen Inc.</u>, No. 4:08-CV-180-FL, 2009 U.S. Dist. LEXIS 75177, at *6-7 (E.D.N.C. July 24, 2009) (unpublished) (internal record citations omitted), <u>recommendation adopted</u>, 2009 U.S. Dist. LEXIS 72732 (E.D.N.C. Aug. 17, 2009) (emphasis in original). <u>See also</u> <u>N.C. Nat'l Bank v. Burnette</u>, 297 N.C. 524, 536, 256 S.E.2d 388, 394 (1979) ("The mandate of procedural due process contained

in [the North Carolina] Constitution and in the Fourteenth Amendment applies only to actions by the government which deprive individuals of their fundamental rights. This constitutional shield does not protect citizens from the actions or activities of other private individuals." (internal citations omitted)).

FedEx is a private employer and, thus, Bethel's instant claim fails as a matter of law.

## III.  CONCLUSION

With respect to each of his claims, Bethel has failed to "set forth specific facts showing that there is a *genuine issue for trial*." Matsushita Elec. Indus. Co., 475 U.S. at 586-87 (emphasis in original). Accordingly,

**IT IS RECOMMENDED** that FedEx's Motion for Summary Judgment (Docket Entry 16) be **GRANTED**.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

August 16, 2010